# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
### MILWAUKEE DIVISION

| | |
|---|---|
| SHARON MEYER, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br> v. <br><br> MIDLAND CREDIT MANAGEMENT, INC., and MIDLAND FUNDING, LLC, <br><br> Defendants. | Case No.: 17-cv-1466 <br><br> **AMENDED CLASS ACTION COMPLAINT** <br><br> **Jury Trial Demanded** |

## INTRODUCTION

1. Plaintiff brings this action to secure redress for a course of conduct that included, among other things, the accessing of a consumer report on Plaintiff without Plaintiff's consent or for any lawful reason, in violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq.* ("FCRA"). This class action also seeks redress for collection practices that violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* (the "FDCPA") and the Wisconsin Consumer Act, chapter 427, Wisconsin Statutes (the "WCA").

## JURISDICTION AND VENUE

2. The court has jurisdiction to grant the relief sought by the Plaintiff pursuant to 15 U.S.C. §§ 1681n, 1692k and 28 U.S.C. §§ 1331, 1337 and 1367. Venue in this District is proper in that Defendants directed their collection efforts into the District.

## PARTIES

3. Plaintiff Sharon Meyer ("Meyer") is an individual who resides in the Eastern District of Wisconsin (Milwaukee County).

4. Meyer is a "consumer" as defined in the FDCPA, 15 U.S.C. § 1692a(3), in that Defendants sought to collect from her a debt allegedly incurred for personal, family or household purposes.

5. Meyer is also a "consumer" as defined in the FCRA, 15 U.S.C. § 1681a(c) ("The term 'consumer' means an individual.")

6. Meyer is also a "customer" as defined in the Wisconsin Consumer Act, Wis. Stat. § 421.301(17), in that she engaged in a consumer credit transaction.

7. Defendant Midland Credit Management, Inc. ("MCM") is a foreign corporation with its principal place of business located at 3111 Camino Del Rio North, Suite 103, San Diego, CA 92108.

8. MCM is engaged in the business of a collection agency, using the mails and telephone to collect consumer debts originally owed to others.

9. MCM is a "person" as defined in the FCRA, 15 U.S.C. § 1681a(b) ("The term 'person' means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity.").

10. MCM is engaged in the business of collecting debts owed to others and incurred for personal, family or household purposes. Midland is a debt collector as defined in 15 U.S.C. § 1692a and Wis. Stat. § 427.103(3).

11. Defendant Midland Funding, LLC ("Midland Funding") is a limited liability company with its principal place of business located at 3111 Camino Del Rio North, Suite 103, San Diego, CA 92108.

12. Midland Funding is engaged in the business of a collection agency under Wisconsin law, in that it purchases and receives assignment of consumer debts that are in default at the time Midland Funding acquires them.

13. Wis. Stat. § 427.103(3) defines debt collector as: "any person engaging, directly or indirectly, in debt collection, and includes any person who sells, or offers to sell, forms

2

represented to be a collection system, device or scheme, intended or calculated to be used to collect claims. The term does not include a printing company engaging in the printing and sale of forms." (emphasis added). On its face, Wis. Stat. § 427.103(3) applies to creditors collecting on their own behalf.

14. Wis. Stat § 427.103(2) states: "Debt collection" means any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due a merchant by a customer."

15. Midland Funding is a "merchant" as defined in the WCA, as it has, or claims to have, taken assignment of Plaintiff's former "Synchrony Bank" ("Synchrony") consumer credit card account. Wis. Stat. § 421.301(25) ("The term [merchant] includes but is not limited to a seller, lessor, manufacturer, creditor, arranger of credit and any assignee of or successor to such person.")

16. The Western District of Wisconsin has noted: "Unlike the FDCPA, the Wisconsin Consumer Act does not provide exceptions to its general definition of a debt collector." *Hartman v. Meridian Fin. Servs.*, 191 F. Supp. 2d 1031, 1048 (W.D. Wis. 2002).

17. The Wisconsin Department of Financial Institutions has likewise designated merchants and creditors as "Debt Collectors" under the WCA:

> Anyone attempting to collect a debt arising from a consumer credit transaction in Wisconsin, whether a merchant doing its own debt collecting or a third-party debt collector, must follow Wisconsin's debt collection law, Ch. 427, Wis. Stats. This is an important point because many merchants collecting debt owed directly to them mistakenly believe that they are exempt from Wisconsin's debt collection law because they are not included within the definition of "debt collector" under the federal Fair Debt Collection Practices Act.

https://www.wdfi.org/wca/business_guidance/creditors/debt_collection/

18. Midland Funding uses third party debt collectors, including MCM, to collect allegedly defaulted debts that have been assigned to Midland.

19. A company meeting the definition of a "debt collector" (here, Midland Funding) is vicariously liable for the actions of a second company collecting debts on its behalf. *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325-26 (7th Cir. 2016) (assignees who are "debt collectors" are responsible for the actions of those collecting on their behalf); *citing Pollice*, 225 F.3d at 404-05.

20. Hereinafter, and unless a particular defendant is specified, MCM and Midland Funding are collectively referred to as "Midland."

## **FACTS**

21. Meyer had an alleged BP (i.e. British Petroleum) branded personal credit card account, originally owed to Synchrony. The account went into default after Meyer fell behind on payments.

22. On or about April 30, 2017, Synchrony sent Meyer a letter notifying Meyer that Synchrony had sold Meyer's account to MCM. A copy of this letter is attached to this complaint as Exhibit A.

23. On or about May 27, 2016, MCM mailed a debt collection letter to Meyer regarding an alleged debt, allegedly owed to Midland Funding and originally owed to Synchrony. A copy of this letter is attached to this complaint as Exhibit B.

24. The alleged debt identified in Exhibit B is the Plaintiff's alleged BP branded personal credit card account, originally owed to Synchrony. *See* https://www.mybpstation.com/cards.

25. Upon information and belief, Exhibit B is a form letter, generated by computer, and with the information specific to Meyer inserted by computer.

26. Upon information and belief, Exhibit B is a form debt collection letter used by MCM to attempt to collect alleged debts.

27. Meyer used this credit card only for personal, family or household purposes, namely, purchases of household goods and services, including purchasing gasoline and personal items at BP gas stations. Meyer did not open or use the credit card account for any business purpose.

28. The credit card account identified in Exhibit B was in default, closed, and upon information and belief, charged off by Synchrony, before Synchrony sent Exhibit A to Meyer.

29. Exhibit B states the following:

> Welcome! On 04-29-2016, your Synchrony Bank / BP account was sold to MIDLAND FUNDING LLC, which is now the sole owner of this debt. Midland Credit Management, Inc. ("MCM"), a debt collection company, will be collecting on, and servicing your account, on behalf of MIDLAND FUNDING LLC.

30. Exhibit B also states:

> This account may still be reported on your credit report as unpaid.
>
> We will not report your debt to the credit bureaus if you set up a payment plan, make a payment by 08-27-2016 and make all payments as agreed.

31. Meyer did not make a payment to MCM at any time.

32. Meyer did not set up a payment plan with MCM at any time.

33. Upon information and belief, Midland reported Meyer's alleged debt to the three major credit reporting agencies ("CRAs") sometime around August 27, 2016.

34. MCM sent another letter to Meyer on or around October 24, 2016. A copy of this letter is attached to this complaint as Exhibit C.

35. Plaintiff received Exhibit C on or after October 26, 2016.

5

36. <u>Exhibit C</u> states the following:

> 10-24-2016
>
> RE: Synchrony Bank / BP
>
> Dear Sharon,
>
> The above-referenced **Synchrony Bank** account was transferred to MIDLAND FUNDING LLC and referred to Midland Credit Management, Inc. ("MCM") for debt collection. MCM has since been informed that this account was transferred in error and has been recalled by **Synchrony Bank**.
>
> We have instructed the three major credit reporting agencies to delete any MCM entry regarding this account from your credit report. You have no financial obligation to **MIDLAND FUNDING LLC** or MCM regarding this matter.
>
> If you have any questions regarding when this change will be reflected on your credit report, please contact the reporting agencies in writing, or by calling:
>
> | Equifax/CBI | Experian | Trans Union |
> |---|---|---|
> | PO Box 740241 | PO Box 2002 | PO Box 2000 |
> | Atlanta, GA 30374-0241 | Allen, TX 75013 | Chester, PA 19022 |
> | (800) 685 – 1111 | (888) 397 – 3742 | (800) 916 – 8800 |
> | www.equifax.com | www.experian.com/reportaccess | www.transunion.com |

37. Upon information and belief, <u>Exhibit C</u> falsely and misleadingly states that Meyer's Synchrony account was transferred to Midland Funding. The unsophisticated consumer would not know what that statement means.

38. An account can generally be "transferred" from a creditor like Synchrony to a debt collector in several different ways. The creditor can transfer an account for collection while retaining full ownership of the account. The creditor can also transfer "servicing rights" to a debt collection agency while also retaining ownership. Under the typical servicing arrangement, the debt collector takes over regular billing, in addition to collecting past due amounts. The creditor can also sell the debt outright.

39. <u>Exhibit C</u> is facially unclear about what actually happened to Meyer's account between April and August 2016.

40. Although the unsophisticated consumer is not expected to know this, MCM and Midland Funding are part of one of the largest debt buyer and debt collection outfits in the industry, with consumer debt portfolios in the hundreds of millions of dollars. The 2013 10-K filing for MCM and Midland Funding's parent company, Encore Capital Group ("Encore"),

6

states that Encore has "one of the industry's largest financially distressed consumer databases." (Form 10-K, 12/31/13, p. 2).

41. According to Encore's 2013 Form 10-K, Encore *spent* more than $525 million to purchase consumer credit card accounts in the U.S. As Midland paid less than 10 cents on the dollar, the face value of those accounts is in the tens of billions of dollars. Encore purchased similar amounts of U.S. consumer credit card accounts in 2012 and 2011.

42. Upon information and belief, neither MCM nor Midland Funding service debts on behalf of other entities that are not Encore's corporate affiliates. Thus, once an account is sold to Midland Funding, the creditor retains no further interest in the debt.

43. Synchrony cannot simply "recall" a debt from Midland unless Synchrony never transferred ownership rights to the debt to Midland Funding in the first place.

44. Upon information and belief, Midland never actually took assignment of Meyer's BP card from Synchrony.

45. Upon information and belief, despite not actually taking ownership of Meyer's Synchrony account from Synchrony, Midland reported Meyer's accounts to the three major CRAs.

46. Upon information and belief, Midland, as a regular business practice, obtains consumer reports from one or more of the three primary CRAs for all or virtually all of its accounts.

47. Midland regularly pursues collection through litigation. For example, Midland filed over 100 collection lawsuits in Milwaukee County in September 2017 alone.

48. Upon information and belief, Midland uses consumers' consumer reports to determine whether to sue the consumer or whether she is uncollectible.

49. Upon information and belief, Midland obtained consumer reports from one or more of the three primary CRAs (TransUnion, Equifax, and Experian) on or around August 27, 2016, for the purpose of determining whether and to what extent Meyer is collectible.

### *FCRA Violations*

50. The FCRA, 15 U.S.C. § 1681b, provides it is permissible to obtain a consumer report on a consumer only with the written consent of the consumer or for certain "permissible purposes," such as the extension of credit to, or review or collection of an account of, the consumer, employment purposes, the underwriting of insurance, or in connection with a business transaction that is initiated by the consumer.

51. The requester must certify to the consumer reporting agency that a permissible purpose exists.

52. One "permissible purpose" is debt collection. 15 U.S.C. § 1681b(a)(3)(A).

53. Midland, however, never actually took assignment of Meyer's account.

54. Midland had no legal basis collect the account from Meyer, and had no ownership interest in the debt. As such, Midland could not sue Meyer to collect the debt.

55. Since, upon information and belief, Midland never took assignment of Meyer's Synchrony account, it had no permissible purpose to access Meyer's consumer reports.

56. The sending of the material in Exhibit B does not constitute a permissible reason for anyone to access a consumer report on plaintiffs without plaintiffs' consent.

### *FDCPA and WCA Violations*

57. Exhibits A-C are false, misleading, and confusing to the unsophisticated consumer.

58. Midland never actually took assignment of Meyer's account.

59. Midland had no legal basis collect the account from Meyer, and had no ownership interest in the debt. As such, Midland could not sue Meyer to collect the debt.

60. Since, upon information and belief, Midland never took assignment of Meyer's Synchrony account, its representations that to that effect were false and misleading.

61. Moreover, Midland's ambiguous references to the status of the account and "recall" are confusing and misleading to the unsophisticated consumer.

62. Meyer was confused by Exhibits A-C.

63. Meyer had to spend time and money investigating Exhibits A-C, and the consequences of any potential responses to Exhibits A-C.

64. Meyer had to take time to obtain and meet with counsel, including traveling to counsel's office by car and its related expenses, including but not limited to the cost of gasoline and mileage, to advise Meyer on the consequences of Exhibits A-C.

65. The FDCPA creates substantive rights for consumers; violations cause injury to consumers, and such injuries are concrete and particularized. *Bock v. Pressler & Pressler, LLP*, No. 11-7593, 2017 U.S. Dist. LEXIS 81058 *21 (D.N.J. May 25, 2017) ("through [s]ection 1692e of the FDCPA, Congress established 'an enforceable right to truthful information concerning' debt collection practices, a decision that 'was undoubtedly influenced by congressional awareness that the intentional provision of misinformation' related to such practices, 'contribute[s] to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy,'"); *Quinn v. Specialized Loan Servicing, LLC*, No. 16 C 2021, 2016 U.S. Dist. LEXIS 107299 *8-13 (N.D. Ill. Aug. 11, 2016) (rejecting challenge to Plaintiff's standing based upon alleged FDCPA statutory violation); *Lane v. Bayview Loan Servicing, LLC*, No. 15 C 10446, 2016 U.S. Dist. LEXIS 89258 *9-10 (N.D. Ill. July 11, 2016)

9

("When a federal statute is violated, and especially when Congress has created a cause of action for its violation, by definition Congress has created a legally protected interest that it deems important enough for a lawsuit."); *Church v. Accretive Health, Inc.*, No. 15-15708, 2016 U.S. App. LEXIS 12414 *7-11 (11th Cir. July 6, 2016) (same); *see also Mogg v. Jacobs*, No. 15-CV-1142-JPG-DGW, 2016 U.S. Dist. LEXIS 33229, 2016 WL 1029396, at *5 (S.D. Ill. Mar. 15, 2016) ("Congress does have the power to enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute," (quoting *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). For this reason, and to encourage consumers to bring FDCPA actions, Congress authorized an award of statutory damages for violations. 15 U.S.C. § 1692k(a).

66.     Moreover, Congress has explicitly described the FDCPA as regulating "abusive practices" in debt collection. 15 U.S.C. §§ 1692(a) – 1692(e). Any person who receives a debt collection letter containing a violation of the FDCPA is a victim of abusive practices. *See* 15 U.S.C. §§ 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses").

67.     The Wisconsin Consumer Act ("WCA") was enacted to protect consumers against unfair, deceptive, and unconscionable business practices and to encourage development of fair and economically sound practices in consumer transactions. Wis. Stat. § 421.102(2).

68.     The Wisconsin Supreme Court has favorably cited authority finding that the WCA "goes further to protect consumer interests than any other such legislation in the country," and is "probably the most sweeping consumer credit legislation yet enacted in any state." *Kett* v.

10

*Community Credit Plan, Inc.,* 228 Wis. 2d 1, 18 n**.**15, 596 N.W.2d 786 (1999) (citations omitted).

69. To further these goals, the Act's protections must be "liberally construed and applied." Wis. Stat. § 421.102(1); *see also* § 425.301.

70. "The basic purpose of the remedies set forth in Chapter 425, Stats., is to induce compliance with the WCA and thereby promote its underlying objectives." *First Wisconsin Nat'l Bank v. Nicolaou*, 113 Wis. 2d 524, 533, 335 N.W.2d 390 (1983). Thus, private actions under the WCA are designed to both benefit consumers whose rights have been violated and also competitors of the violators, whose competitive advantage should not be diminished because of their compliance with the law.

71. To carry out this intent, the WCA provides Wisconsin consumers with an array of protections and legal remedies. The Act contains significant and sweeping restrictions on the activities of those attempting to collect debts. *See* Wis. Stats. § 427.104.

72. The Act limits the amounts and types of additional fees that may be charged to consumers in conjunction with transactions. Wis. Stats. § 422.202(1). The Act also provides injured consumers with causes of action for class-wide statutory and actual damages and injunctive remedies against defendants on behalf of all customers who suffer similar injuries. *See* Wis. Stats. §§ 426.110(1); § 426.110(4)(e). Finally, "a customer may not waive or agree to forego rights or benefits under [the Act]." Wis. Stat. § 421.106(1).

73. Consumers' WCA claims under Wis. Stat. § 427.104(1) are analyzed using the same methods as claims under the FDCPA. While the Seventh Circuit has not squarely interpreted how WCA cases based upon the content of debt collection letters should be determined, federal courts in this District and the state courts in Wisconsin generally look to

11

FDCPA case law for guidance. Indeed, the WCA itself requires that the court analyze the WCA "in accordance with the policies underlying a federal consumer credit protection act," including the FDCPA. Wis. Stat. § 421.102(1).

74. Further, the Wisconsin Supreme Court has held that WCA claims relating to debt collection are to be analyzed under the "unsophisticated consumer" standard. *Brunton v. Nuvell Credit Corp.*, 785 N.W.2d 302, 314-15. In *Brunton*, the Wisconsin Supreme Court explicitly adopted and followed the "unsophisticated consumer" standard, citing and discussing *Gammon v. GC Servs. Ltd. P'ship*, 27 F.3d 1254, 1257 (7th Cir. 1994). *Id.*

75. 15 U.S.C. § 1692e generally prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt."

76. 15 U.S.C. § 1692e(10) specifically prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt.

77. 15 U.S.C. § 1692f generally prohibits "unfair or unconscionable means to collect or attempt to collect any debt."

78. 15 U.S.C. § 1692f(1) specifically prohibits the "collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."

79. Chapter 427, Wis. Stats., governs debt collection activities in Wisconsin.

80. Wis. Stat. § 427.104(c) states that a debt collector may not: "Disclose or threaten to disclose information adversely affecting the customer's reputation for credit worthiness with knowledge or reason to know that the information is false."

81. Wis. Stat. § 427.104(1)(j) states that a debt collector may not: "Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist."

12

## COUNT I -- FCRA

82. Meyer incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

83. Count I is brought against all defendants.

84. Plaintiffs incorporate the above-numbered paragraphs by reference.

85. Midland obtained a consumer report on plaintiffs and every other person to whom the form letters represented by <u>Exhibit B</u> was sent without her written permission or a "permissible purpose."

86. Midland, however, never actually took assignment of Meyer's account.

87. Midland had no legal basis to obtain a consumer report about Meyer.

88. Since, upon information and belief, Midland never took assignment of Meyer's Synchrony account, it had no permissible purpose to access Meyer's consumer reports.

89. The sending of the material in <u>Exhibit B</u> does not constitute a permissible reason for anyone to access a consumer report on Meyer without Meyer's consent

90. Defendants' accessing of Meyer's consumer report violated 15 U.S.C. § 1681b(c)(1)(B).

91. Defendants' violation was willful.

92. Defendants are liable to the plaintiffs and class members pursuant to 15 U.S.C. § 1681n.

## COUNT II – FDCPA

93. Meyer incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

94. Count II is brought against Defendant MCM.

13

95. MCM represented that it had purchased Meyer's account when that representation was false.

96. Midland never actually took assignment of Meyer's account.

97. Midland had no legal basis collect the account from Meyer, and had no ownership interest in the debt. As such, Midland could not sue Meyer to collect the debt.

98. Since, upon information and belief, Midland never took assignment of Meyer's Synchrony account, its representations that to that effect were false and misleading.

99. Moreover, Midland's ambiguous references to the status of the account and "recall" are confusing and misleading to the unsophisticated consumer, as they mislead as to the true owner of the debt.

100. MCM violated 15 U.S.C. §§ 1692e, 1692e(10), 1692f and 1692f(1).

## COUNT III -- WCA

101. Meyer incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

102. Count III is brought against all defendants.

103. Exhibit B attempts to collect an account that did not actually exist.

104. Upon information and belief, Midland reported Plaintiff's alleged debt as being owed to Midland to the three major credit reporting agencies ("CRAs") sometime around August 27, 2016.

105. Defendants violated Wis. Stat. §§ 427.104(1)(c) and 427.104(1)(j).

## CLASS ALLEGATIONS

106. Meyer brings this action on behalf of a Class, consisting of (a) all natural persons in the State of Wisconsin (b) who were sent a collection letter in the form represented by Exhibit

14

B to the complaint in this action, (c) and were subsequently sent a letter in the form represented by Exhibit C to the complaint in this action (d) seeking to collect a debt incurred for personal, family or household purposes, (d) between October 27, 2015 and October 27, 2017, inclusive, (e) that was not returned by the postal service.

107. The Class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the Class.

108. There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the Defendant complied with the FCRA, the FDCPA, and the WCA.

109. Meyer's claims are typical of the claims of the Class members. All are based on the same factual and legal theories.

110. Meyer will fairly and adequately represent the interests of the Class members. Meyer has retained counsel experienced in consumer credit and debt collection abuse cases.

111. A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

## JURY DEMAND

112. Meyer hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment in favor of Plaintiffs and the Class and against Defendants for:

(a) actual damages;

(b) statutory damages;

(c) attorneys' fees, litigation expenses and costs of suit; and

(d) such other or further relief as the Court deems proper.

Dated: October 25, 2017

**ADEMI & O'REILLY, LLP**

By: /s/ John D. Blythin
John D. Blythin (SBN 1046105)
Mark A. Eldridge (SBN 1089944)
Jesse Fruchter (SBN 1097673)
Ben J. Slatky (SBN 1106892)
3620 East Layton Avenue
Cudahy, WI 53110
(414) 482-8000
(414) 482-8001 (fax)
jblythin@ademilaw.com
meldridge@ademilaw.com
jfruchter@ademilaw.com
bslatky@ademilaw.com

16